FILED

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

01 APR 25 PM 12: 4

U.S. DISTRICT COURT
H.D. OF ALABAMA

| | |
|---|---|
| HOUGH INTERNATIONAL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )      CV-00-PT-3755-M |
| | ) |
| PENNFIELD CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

ENTERED
APR 25 2001

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause comes on to be heard on defendant's motion(s) to dismiss or transfer. The court has considered affidavits, oral testimony and exhibits.

### Facts

The pertinent facts include the following:

1. The defendant is based in Pennsylvania with no connections or activities in Alabama which could establish <u>general</u> personal jurisdiction over it in Alabama.

2. In early 1994 the plaintiff's agent, Mortimer, made a personal call on the defendant in Lancaster, Pennsylvania. The call was unsolicited and not previously arranged. It was not related to any prior activities between the parties which are of any significance here. Discussions during this call with defendant's representative, Kellar, led to Kellar and another defendant employee traveling, in about July 1994, to the plaintiff's plant in Albertville, Alaba[ma]. The apparent primary purpose of this visit was to tour the plant and discuss the possibility of work on the defendant's "Mt. Joy" facility in Lancaster, Pennsylvania. The court is fully

1

satisfied that Kellar's references in affidavit(s) to these visits taking place in "1995" were meaningless mistakes. The court cannot fathom why his attributing the meetings to 1995 instead of 1994 is other than an insignificant "gotcha."

    3. Although the July 1994 meeting focused on the $600,000.00 Mt. Joy project which the defendant thereafter awarded to the plaintiff, Kellar also came prepared to discuss an additional significant expansion project which ultimately became the South Montrose, Pennsylvania facility, the subject matter of this action.[1]  Plaintiff's Exhibit 3, related to said South Montrose project, was prepared and signed in connection with the July 1994 visit to Alabama. Discussions with reference to South Montrose continued and culminated in a contract between the parties dated December 16, 1998.

    4. In the interim period between July 1994 and December 16,1998, the following significant events occurred.

        a. The Mt. Joy project in Lancaster was satisfactorily completed by the plaintiff in late 1995 or early 1996.

        b. The parties continued to discuss the South Montrose project.  An early significant step came in March 1996, when plaintiff's Exhibit 4 was executed.  This "letter of intent" contemplated that the plaintiff would be paid for performing engineering work at its Alabama plant site in connection with the proposed South Montrose project.

        c. Various location(s) were considered for what became the South Montrose project.  The plaintiff's and defendant's representative(s) visited at least one site in New York.

        d. Various possibilities were considered for plaintiff's degree of participation in

---

[1] Hereinafter referred to as the "South Montrose" project even though that location did not become fixed until about November 1997.

2

the South Montrose project. This varied from, initially , engineering only, which would have been primarily, if not totally, performed in Alabama, to engineering and procurement (again, primarily in Alabama), to engineering, procurement and construction all of which became an integral part of the 1998 contract. As the court has suggested, the relationship became "pregnant" in Alabama with engineering work and procurement and the "baby" was delivered in Pennsylvania.

     e. On various occasions between 1994 and 1998, Kellar came to Alabama to review, discuss and make changes in proposed blueprints. While this was not a negotiation, as such, of what became to be known as the "terms and conditions" of the contract, it was a significant negotiation of the work to be performed and the specifications related thereto. There was continued planning for the project, a significant part of which took place in Alabama.

     f. The fixing of the location of the subject project at South Montrose resulted in a final determination of the size, scope of work, and anticipated cost of the project which was finally memorialized in the December 16, 1998 contract. The evolution from July 1994 to December 16, 1998 included various decisions as to what work would and would not be performed by the plaintiff. The defendant ultimately opted for the plaintiff to provide materials, services and labor. This included substantial engineering, manufacture, and procurement in Alabama. The products were not just "off the rack" kinds of materials, but equipment, etc., specially designed and manufactured for the defendant based upon blueprints and specifications substantially worked on by both the plaintiff and the defendant in Alabama.

     g. With regard to the issue of whether the defendant could have reasonably anticipated being "haled" into Alabama, it could have, along with other reasons, been so alerted when the plaintiff refused the contract language which the defendant sought, placing the lawsuit

3

forum in Pennsylvania.  The contract does include a Pennsylvania choice of law provision.

h.  During the 1994-1998 period, the plaintiff's representative(s) went to Pennsylvania on several occasions to discuss the project.

CONCLUSIONS OF LAW

### A. Standard of Review

When a district court does not conduct an evidentiary hearing on a motion to dismiss for lack of jurisdiction, the plaintiff must establish a prima facie case of personal jurisdiction over the non-resident defendant.  See Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990).  A plaintiff establishes a prima facie case when she or he presents enough evidence to withstand a motion for directed verdict.  See id.  The district court must accept the facts as alleged in the complaint as true, but only to the extent they are uncontroverted by the defendant's affidavits. See id.  Where factual conflict is present and the court does not conduct an evidentiary hearing, the court must construe all reasonable inferences in favor of the non-moving party.  See id..  See also Francosteel Corp. v. M/V Charm, 19 F.3d 624, 626 (11th Cir. 1994); Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc., 207 F.3d 1351, 1356 (11th Cir. 2000).   Whether a district court conducts an evidentiary hearing is discretionary.  See Madara, 916 F.2d at 1514; Ruiz de Molina, 207 F.3d at 1356.  In assessing the propriety of a motion to dismiss for lack of jurisdiction, a district court is not limited to inquiry into undisputed facts; the court may hear conflicting evidence and decide for itself factual issues that determine jurisdiction.  See Colonial Pipeline Co. v. Collins, 921 F.2d 1237, 1243-44 (11th Cir. 1991) (dealing with subject matter jurisdiction).  A plaintiff should generally have ample opportunity to present evidence bearing on the existence of jurisdiction.  See id.  In summary, if a material issue is contested and there is conflicting evidence, a court must either deny the motion to dismiss and postpone any further

4

jurisdiction challenge until trial, or hold a preliminary evidentiary hearing. See Chalwest (Holdings) Ltd. v. Ellis, 924 F.2d 1011, 1014 (11th Cir. 1991). This court has conducted an evidentiary hearing.

### B. Personal Jurisdiction

Defendant contends that there can be no general jurisdiction over it as it has no regular contacts with the State of Alabama in any way. Defendant argues that there can be no specific jurisdiction over it as well because its contacts with plaintiff are not sufficient for it to be haled into court here. Plaintiff argues that there may be general jurisdiction over defendant, and, in any case, defendant's contacts with plaintiff and Alabama are sufficient to give this court specific jurisdiction over the defendant.

As an initial matter, the court notes that there are two types of personal jurisdiction: general and specific. See, e.g., Madara, 916 F.2d at 1516 n.7. "Specific personal jurisdiction is founded on a party's contacts with the forum state that are related to the cause of action. General personal jurisdiction arises from a party's contacts with the forum state that are unrelated to the litigation." Id. (citing Helicopteros Nacionales de Colombia N.A. v. Hall, 466 U.S. 408, 414 nn. 8 & 9 (1984); Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829, 857 n.41 (11th Cir. 1990); Morris v. SSE, Inc., 843 F.2d 489, 491 n.2 (11th Cir. 1988)). It appears from the record that general personal jurisdiction of defendant in Alabama is unlikely at best. Thus, the court will focus its attention on whether it has specific personal jurisdiction over defendant.

Courts employ a two-part analysis when determining whether they have personal jurisdiction over a non-resident. See Madara, 916 F.2d at 1514. A court first determines whether jurisdiction is proper under the forum state's long arm statute. See id. If the first prong

is met, the court next considers whether its exercise of jurisdiction will offend federal due process requirements. <u>See</u> <u>Francosteel</u>, 19 F.3d at 627. This second prong is itself a two-part inquiry. <u>See</u> <u>Madara</u>, 916 F.2d at 1515-16. First, the court must decide whether the defendant has established "minimum contacts" with the forum state. <u>See</u> <u>id.</u> Second, the court must decide whether the exercise of personal jurisdiction over the defendant would offend "traditional notions of fair play and substantial justice." <u>See</u> <u>id.</u> (citing <u>Williams Elec. Co. v. Honeywell, Inc.</u>, 854 F.2d 389, 392 (11th Cir. 1988) (quoting <u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1940))). If all of these elements are met, the court may exercise jurisdiction over the defendant.

The first question for this court, then, is whether jurisdiction is proper under Alabama's long arm statute. Alabama's long-arm statute provides, in pertinent part, that:

> [a] person has sufficient contacts with the state when that person ... otherwise having some minimum contact with this state and, under the circumstances, it is fair and reasonable to require the person to come to this state to defend an action ... so long as the prosecution of the action against a person in this state is not inconsistent with the constitution of this state or the Constitution of the United States.

ALA. R. CIV. P. 4.2(a)(2)(I). As such, it is as broad as is permissible under the limits of federal due process. <u>See</u> <u>Alabama Waterproofing Co., Inc. v. Hanby</u>, 431 So.2d 141, 145 (Ala. 1983); <u>Oliver v. Merritt Dredging Co., Inc.</u>, 979 F.2d 827, 830 (11th Cir. 1992); <u>Butler v. Beer Across America</u>, 83 F. Supp. 2d 1261, 1265-66 (N.D. Ala. 2000). Because the Alabama inquiry and federal inquiry as to personal jurisdiction are coextensive, this court need only consider whether the exercise of specific personal jurisdiction here will satisfy the federal requirements of due process. <u>See</u> <u>Oliver</u>, 979 F.2d at 830; <u>Banton Industries, Inc. v. Diamatic Die & Tool Co.</u>, 801 F.2d 1283, 1284 (11th Cir. 1986); <u>Butler</u>, 83 F. Supp. 2d at 1266. The court next turns to the

6

federal due process requirements.

**Minimum Contacts**

"Where a forum seeks to assert specific personal jurisdiction over a nonresident defendant, due process requires that the defendant have 'fair warning' that a particular activity may subject him [or her] to the jurisdiction of a foreign sovereign." Madara, 916 F.2d at 1516 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1977) (Stevens, J. concurring in judgment)). A defendant has established minimum contacts with the forum state for purposes of personal jurisdiction when his contacts with that state are "substantial enough that [he] reasonably could expect to be haled before [that forum's] court." Delong Equipment, 840 F.2d at 853. A defendant should possess this reasonable expectation "if the defendant purposefully directs its activities at forum residents and 'the litigation results from alleged injuries that arise out of or relate to those activities.'" Id. (quoting Burger King, 471 U.S. at 472). According to the Supreme Court in Burger King, "[w]here the defendant 'deliberately' has engaged in significant activities within a State . . . he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws, it is presumptively not unreasonable to require him to submit to the burdens of the litigation in the forum as well." 471 U.S. at 476.

Jurisdiction is proper where the defendant has proximately created, through his or her own actions, a "substantial connection" with the forum state. Burger King, 471 U.S. at 475 (quoting McGee v. International Life Ins. Co., 355 U.S. 220, 223 (1957)). Jurisdiction is also proper when the defendant has purposely availed itself of the benefits and protections of the laws of the forum state. Hanson v. Denckla, 357 U.S. 235, 253 (1958); Ruiz de Molina, 207 F.3d at 1356. Generally, "with respect to interstate contractual obligations, [the Supreme Court has]

7

emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other [s]tate for the consequences of their activities." Burger King, 471 U.S. at 473.

**Fair Play and Substantial Justice**

Once the first prong of due process is satisfied, the court next looks to whether its assertion of personal jurisdiction over the defendant would comport with "fair play and substantial justice." See Madara, 916 F.2d at 1517 (citing Burger King, 471 U.S. at 476 (quoting International Shoe, 326 U.S. at 320)). The factors utilized by courts in determining this are the burden on the defendant in defending the lawsuit in the subject forum, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective judicial relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering their own state policies. See Madara, 916 F.2d at 1517 (citing Burger King, 471 U.S. at 177; and World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)).

**Analysis of Case Law**

In Madara, the Eleventh Circuit Court of Appeals found that a performer did not have sufficient contacts with Florida to be haled into court there. The performer, Daryl Hall, gave a telephone interview from New York with a California based reporter. The interview was then printed in a magazine, over which Hall had no control, which was distributed in Florida. The plaintiff was not a resident of Florida, but brought suit there because the statute of limitations had not yet expired in that state and had elsewhere. The court held that Florida did not have general personal jurisdiction over Hall, and that Florida did not have specific personal jurisdiction over Hall based on this one interview. Hall did not make any "purposeful act,

8

directed at the forum state." 916 F.2d at 1519 (citing Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 112 (1987)). The court further held that the burden on Hall to defend in Florida would be great, and that Florida had little interest in adjudicating the action. This case bears little factual similarity to Madara. Here, the parties' dispute concerns a contract that was executed after the defendant's representatives had visited the forum state several times and had made changes to proposed plans.

In Sea Lift, Inc. v. Refinadora Costarricense De Petroleo, S.A., 792 F.2d 989 (11th Cir. 1986), the Eleventh Circuit reversed the district court's holding that it had jurisdiction over a Costa Rican defendant. The plaintiff, Sea Lift, Inc., was a Florida corporation hired through the insurer of the defendant state-owned Costa Rican company to salvage a sunken barge located in Costa Rican waters. The defendant's insurer, Lloyd's of London, contacted London Salvage, a New York affiliate of Lloyd's, to solicit Sea Lift's services. A boiler-plate contract was signed by the defendant's representatives in Costa Rica, and signed by Sea Lift in Miami, Florida. The contract terms specifically provided that the law of England would govern. The court noted that "[t]he mere 'foot-fall' of the defendant's agents 'on the State's soil' does not in the relevant sense invoke the benefits and protections of the laws of the forum," citing Wisconsin Elec. Mfr. Co. v. Pennant Prods., Inc., 619 F.2d 676, 678 n.8 (7th Cir. 1980) (quoting Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc., 239 F.2d 502, 509 (4th Cir. 1956)), and that a contract between the two parties in different forums does not, by itself, amount to purposeful availment, citing Afram Export Corp. v. Metallurgiki Halyps, S.A., 772 F.2d 1358, 1362 (7th Cir. 1985) (citing Burger King, 105 S.Ct. 2174, 2185). The court concluded that due process would not allow for haling the Costa Rican company into Florida court because, although some Florida activities occurred, Sea Lift's duties were to be performed exclusively in Costa Rica, and the contract provided that

9

English law would govern. Again, this case is unlike the instant case, in which a substantial amount of the contract was to be performed in Alabama, and the defendant's representatives' appearances in Alabama were numerous and in direct relation to the negotiation of the contract at issue.

In Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc., 786 F.2d 1055 (11th Cir. 1986), the Eleventh Circuit held that the defendant was not subject to specific personal jurisdiction in Missouri where the subject merchandise was manufactured in Missouri, the defendant's employees entered Missouri to return the goods, and the defendant placed a trade acceptance with a Missouri bank for payment. The court noted that the defendant's physical entry into the state was jurisdictionally significant, but was insufficient to base jurisdiction as the defendant was simply returning unwanted goods. The court found the placement of the trade acceptance to be entirely insignificant. The bulk of the court's holding rested on the manufacture of goods in Missouri. The court noted that the contact was an isolated purchase, there had been no prior dealing between the parties, and there was no supervision or participation by the defendant in the production process. Based on these factors, the court found jurisdiction to be lacking. This case is helpful in this court's decision, but not determinative. While both involve production of goods in the forum state, in this case defendant visited the plant not to return goods, but to inspect the plant, review blueprints, and conduct some negotiations. As the court in Borg-Warner noted, this fact is jurisdictionally significant.

The court in Borg-Warner relied heavily on Owen of Georgia, Inc. v. Blitman, 462 F.2d 603 (5th Cir. 1972).[2] According to Borg-Warner, "Blitman stands for the proposition that a mere

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit, including Unit A, handed down on or

one-time purchaser of goods from a seller in the forum state cannot be constitutionally subject to the exercise of personal jurisdiction by the courts of the forum state." 786 F.2d at 1059.  In Blitman, defendants were building a housing project in Boston, Massachusetts.  In need of steel for the project, defendants orally contracted with a Massachusetts corporation, Design Structures, Inc., for the production of the needed steel.  Design Structures then arranged for the steel production through the plaintiff company in Georgia.  A representative of the plaintiff then traveled to Massachusetts to met with the representatives of the defendants, and allegedly entered into a contract for steel to be manufactured in the plaintiff's Georgia facility.  Both parties denied that Design Structures was their agent, and the plaintiff submitted an affidavit to this fact.  The court held that, based on this evidentiary submission, such a showing was insufficient to assert jurisdiction.  The case seemed to rest essentially on a lack of evidence presented to the court, and the uncertainty of the court regarding Design Structures's role as agent or representative.

In Banton Industries, 801 F.2d 1283, the Eleventh Circuit affirmed the district court's finding of lack of jurisdiction.  Banton, an Alabama corporation, placed an unsolicited order in early 1985 for the purchase of goods from Dimatic, a company  located in Nebraska.  The parties had conducted similar transactions since 1981.  The goods were produced in Nebraska and shipped F.O.B. Omaha.  The court held that Alabama did not have jurisdiction over Dimatic as it was not an Alabama corporation, it did not seek orders from Alabama, no representative of it ever entered Alabama, and its goods were retrieved from the plaintiff in Nebraska.  In contrast, in this case  representative(s) of defendant visited plaintiff's facilities in Alabama, and

---

before September 30, 1981.

11

substantial work was done in Alabama.

In Hydrokinetics, Inc. v. Alaska Mechanical, Inc., 700 F.2d 1026 (5th Cir. 1983), the Fifth Circuit Court of Appeals held that the Alaska based defendant did not purposefully avail itself of the privilege of doing business in Texas sufficient to warrant jurisdiction. Referred to each other by a mutual contact, the parties, by telex, telephone and letter conducted contract negotiations. During negotiations, two officers of the defendant inspected the plaintiff's equipment and operations in Texas. The parties later agreed that the plaintiff in Texas would manufacture and deliver to Alaska certain goods. Alaska Mechanical did not regularly engage in business in Texas or in any state other than Alaska. The agreement provided that Alaskan law would govern. The court also made special note of the fact that the contract provided that Alaskan law would apply.

Although factually similar in some respects, Hydrokinetics is nevertheless distinguishable from the instant case. The contract in Hydrokinetics did not create the kind of lengthy, entangled relationship between the parties that is present here. In Hydrokinetics, the parties did not even deal directly with each other initially, unlike the parties in the instant case. Id. at 1027. The Hydrokinetics contract called for the manufacturing and delivery of "five waste heat recover silencer units," a very discreet purchase order. Id. In the instant case, the responsibility of the Alabama plaintiffs grew from providing simply the engineering, to providing engineering, manufacturing, and installation. The parties in Hydrokinetics did not have a prior transactional relationship, Id. at 1028, while the parties in the instant case had established at least a four-year-long relationship before the contract at issue was signed. In Hydrokinetics, virtually all of the negotiations for the contract took place by telephone, telefax, and letter; the Fifth Circuit noted that the only activities that the defendant performed in the

12

forum state consisted of two trips to the forum state and payments to the forum state and the payments that the defendant mailed to the plaintiff in the forum state. Id. at 1029. The defendant's visits were for the purposes of inspecting the plaintiff's facilities during contract negotiations and attempting to resolve the dispute between the parties after the contractual relationship soured. Id. In the instant case, the defendant traveled to Alabama numerous times in order to consult with the plaintiff on plan specifications and blueprints. The plaintiff and the defendant worked together on the Montrose project for four years before the contract was even signed, a collaborative effort that, while it did not establish the terms and conditions of the future contractual relationship, nevertheless clarified the parties' desires, capabilities, and, eventually, responsibilities. The defendant in the instant case directed significantly more commercial efforts toward the Alabama plaintiff over a much longer period of time than the defendant in Hydrokinetics.

In Mississippi Interstate Express, Inc. v. Transpo, Inc., 681 F.2d 1003 (5th Cir. 1982), the Fifth Circuit reversed and remanded a district court holding that the defendants had insufficient contacts with the forum state to subject them to its jurisdiction. Mississippi Interstate, a trucking firm, contacted Traspo, a freight broker located in California, to arrange for the latter's supplying of trucks for the former's use. Transpo stressed to the court that initial contract discussions were in California, that the defendants were all residents of California, that there was no act by the defendants in Mississippi, that all shipments originated and ended in states other than Mississippi, that the defendants had no office or property in Mississippi, that no agent of the defendants had ever been to Mississippi, and that they had not solicited the business from Mississippi. The court, however, concluded that by simply contracting with a Mississippi entity, Transpo purposefully availed itself of the privilege of conducting activities in Mississippi

13

and made it reasonably foreseeable that it might be haled into court there. The court also took

special notice of the nature of Transpo's business:

"In view of the nature of the business of brokering interstate trucking services, it is hardly surprising that the defendant's contacts with any single jurisdiction are comparatively fleeting and slight. We conclude that it is both reasonable and just to require lesser forum contacts of a non-resident defendant in the context of the present facts than have been found necessary to sustain jurisdiction over defendants whose activities have, both generally and with respect to the transaction giving rise to the controversy, a more purely local character. To hold otherwise would tend to immunize from suit by anyone with whom they do business, in any but their home jurisdiction, those engaged in nationwide commercial activity who conduct extensive commercial activity in other jurisdictions primarily by telephone or through the mails."

681 F.2d at 1010.

In Cauff Lippman & Co. v. Apogee Finance Group, Inc., 745 F. Supp. 678 (S.D. Fla.

1990), the district found that it did not have jurisdiction over the New York based defendant

where there was one meeting in Florida prior to the drafting of any agreement, there were

numerous telephone calls, faxes and e-mails between the parties, and payment was to be made in

Florida. The court placed special emphasis on the fact that the single meeting was preliminary,

and that the contract provided that New York law was to govern.   The court in that case did

conduct an evidentiary hearing.

The court now turns to four Alabama Supreme Court decisions which, though not totally

controlling, may help shed some light on the current inquiry. In Ex Parte Phase III Construction,

723 So. 2d 1263 (Ala. 1998), the court held that the defendant company had sufficient contacts

with the state to subject it to personal jurisdiction. Phase III was a Virginia corporation with its

principal office in Virginia, which was not qualified to do business as a foreign corporation in

the State of Alabama, did not transact business in the State of Alabama, and did not own

property in the State of Alabama. A business contact referred Phase III to the Alabama

14

corporation, Collins Signs, Inc. Phase III thereafter contracted with Collins by telephone to purchase and have installed a sign for a restaurant in Virginia. There were at least 10 other contacts between the parties by telephone or mail. The court found that Alabama jurisdiction over Phase III was proper as it initiated contact with the Alabama company for its own profit, availing itself of the privileges of conducting business here; it ordered the manufacture and installation of a sign to be fabricated in Alabama; and its activities were sufficiently systematic and continuous. The case before the court is similar to Phase III. In this case, in addition to the facts present in Phase III, a representative of the defendant visited Alabama several times, and engaged in discussions regarding plans, etc.

In Milltex Industries Corp. v. Jacquard Lace Co., Ltd., 557 So.2d 1222 (Ala. 1990), the Alabama Supreme Court found that it had jurisdiction over a New York defendant where Jacquard, an Alabama corporation, solicited orders from Milltex over the phone. Representatives of both companies met in New York and in Alabama, whereby the parties entered into an oral agreement that Jacquard would produce certain goods in Alabama, F.O.B. Huntsville, Alabama.[3] The court noted that, although Milltex did not initiate contact with Jacquard, it did contract with Jacquard voluntarily. Furthermore, some of the negotiations did take place in Alabama. The contract itself was performed in Alabama. Therefore, the court held that Milltex purposely availed itself of the privilege of conducting business in Alabama, and could therefore be haled into court here.

In The Brick Warehouse, Ltd. v. Sunshine Homes, Inc., 481 So.2d 860 (Ala. 1985), the Alabama Supreme Court held that it had jurisdiction over a Canadian business. In that case, the

---

[3] The contract in the instant case calls for the plaintiff to pay the shipping charges. See Contract, p. 90.

15

defendant placed many orders with the plaintiff for furniture manufactured in Alabama. The Canadian defendant initiated all orders. However, the defendant never visited Alabama, and no written agreements were ever executed. The court held that the defendant could be haled into Alabama courts as it initiated all of the contacts with the Alabama entity, thereby purposefully availing itself of Alabama's laws. The court was not dissuaded by the fact that the plaintiff might have difficulty enforcing any judgment it might gain against the defendant, or by the defendant's inconvenience in litigating in Alabama.

Finally, in Steel Processors, Inc. v. Sue's Pumps, Inc. Rentals, 622 So.2d 910, 913-914 (Ala. 1993), the Alabama Supreme Court concluded that the state of Alabama did not have personal jurisdiction over the defendant even though the goods at issue were fabricated in Alabama, the parties communicated by telephone, and the defendant sent payment checks to the plaintiff in Alabama. According to the Alabama Supreme Court, that the goods were manufactured in Alabama "represents 'unilateral activity of those who claim some relationship with a nonresident defendant [and] cannot [alone] satisfy the requirement of a contract with the forum state." Id. at n. 2 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). As long as the contract does not specifically designate the place of manufacturing, this "unaliteral" characterization could possibly apply, even when the defendant knows that the manufacturing facility is within the forum state. Id. However, in the instant case, the parties contracted specifically for the plaintiff, an Alabama corporation, to provide the engineering work for the Montrose plant, as well as some of the manufacturing work. The contract, therefore, clearly contemplated that, at the very least, the engineering work, as well as some manufacturing, would be performed in Alabama.

## Application

16

**Minimum contacts**

Whether or not minimum contacts have been met is a fact intensive inquiry for which there is no set formula. In <u>Scuptchair, Inc. v. Century Arts, Ltd.</u>, 94 F.3d 623, 631 (11th Cir. 1996), the Eleventh Circuit stated that the "minimum contacts test" is composed of three criteria: "First, the contacts must be related to the plaintiff's cause of action or have given rise to it. Second, the contacts must involve some purposeful availment of the privilege of conducting activities within the forum, thereby invoking the benefits and protections of its laws. Finally, the defendant's contacts within the forum state must be such that [he] could reasonably anticipate being haled into court there."

There is no question that the defendant's alleged contacts with the forum state are related to the plaintiff's cause of action. The defendant's visits to the plaintiff's offices in Alabama, as well as the defendant's sending the "letter of intent" to the plaintiff in Alabama directly resulted in the contract over which the parties are now litigating. The more difficult questions are whether the defendant purposefully availed itself of the benefits and protections of the Alabama laws, and whether it could reasonably have anticipated being haled into court here.

When faced with a "purposeful availment" question, the court should consider "not only the contract itself, but also 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" <u>Sculptchair, Inc. v. Century Arts, Ltd.</u>, 94 F.3d 623, 631 (11th Cir. 1996)(quoting <u>Burger King</u>, 471 U.S. at 479). A defendant has purposefully availed himself of the benefits and protections of the forum's laws when he has either created a "substantial connection" with the forum state by deliberately engaging in significant activities within the state or by creating "continuing obligations" between himself and residents of the forum state. <u>Burger King</u>, 471 U.S. at 475-476. As long as it

17

creates a "substantial connection" with the forum state, even a single act can support personal jurisdiction.[4] Id. at 476 n. 18. Furthermore, personal jurisdiction cannot be avoided simply because the defendant was never physically present in the forum state. Id. at 476. According to the Supreme Court, "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction." Id. It is sufficient to show that the defendant "deliberately reached out beyond" the borders of his own state and into the forum state for the purpose of establishing "continuing and wide-reaching contacts" with an entity in the forum state. Id. at 480; see also Delong Equipment, 840 F.2d at 854.

   The court notes that while the plaintiff initiated the first non-specific sales approach in Pennsylvania, the defendant followed up with a visit to Alabama, where specific projects were discussed. The defendant's first visit to Alabama was followed by several other visits during which plans and specifications were discussed ("negotiated"). The defendant in the instant case began to "reach out beyond" the borders of Pennsylvania and into Alabama, with respect to the Montrose project, when it first discussed the project with the plaintiff during the parties' July 1994 meeting. Subsequently, Kellar deliberately traveled from Pennsylvania to Alabama several times in order to discuss the project's plans and specifications. When the defendant finally

---

[4] The court notes that while the Supreme Court has held that "a defendant's one-time solicitation of business in the forum state is sufficient grounds for the exercise of personal jurisdiction over the defendant," Ex parte Phase III Construction, Inc., 723 So.2d 1263, 1267 (Ala. 1998) (citing McGee v. International Life Ins. Co., 355 U.S. 220 (1957)), this holding, without more in the way of additional factors, is usually reserved for cases involving insurance. See, e.g., McGee, 355 U.S. 220 (due process not violated where California resident insured by Texas insurance company, although insurance company had no offices or agents in California and had never solicited or done any business in California except for the policy involved in this case; Texas company could be haled into California's jurisdiction); Ruiz de Molina, 207 F.3d 1351 (due process not violated where Michigan insurance brokers dealt with Florida insurance broker to provide Alabama resident boat owner with insurance, although Michigan brokers never had any direct contact with Ruiz de Molina in Alabama and all dealings were with Florida; Michigan brokers could be haled into Alabama's jurisdiction); Oliver, 979 F.2d 827 (insurance industry must anticipate that guaranty associations will be haled into numerous courts of differing jurisdictions).

18

awarded the contract to the plaintiff, the contract called for the plaintiff to provide engineering, procurement, manufacturing, services, and labor for the Montrose project. There was four years of collaboration, during which Kellar personally traveled to Alabama several times to discuss the Montrose blueprints. The defendant purposefully directed its activities toward the Alabama plaintiff, efforts that culminated in the 1998 contract's granting continuing, extensive responsibility for the Montrose project to the plaintiff, both in Alabama and in Pennsylvania.

The court briefly will turn its attention to the question of whether the defendant could reasonably anticipate being haled into court in Alabama. Although the Eleventh Circuit in Sculptchair, 94 F.3d at 631, separated the concepts of "purposeful availment" and "reasonable anticipation" into two separate inquiries, the Supreme Court in Burger King suggested that a defendant who purposefully avails himself of the benefits of conducting its activities in the forum state should reasonably anticipate being haled into the forum state's court. 471 U.S. at 474-475. It defined "reasonable anticipation" as requiring contacts with the forum state that are not predicated upon the unilateral activity of the plaintiff or of a third person. Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). In the instant case, this court's findings of fact support a conclusion that the defendant's contacts with the state of Alabama were not brought about because of the unilateral activity of the plaintiff or of a third person. The defendant gradually expanded the plaintiff's contractual responsibilities to include, not only engineering, but also manufacturing, procurement, and labor. This court finds that it would be reasonable for the defendant to anticipate that it could potentially be haled into an Alabama court. The personal jurisdictional "pregnancy" which was established in Alabama as the result of Kellar coming to Alabama to negotiate engineering blueprints and specifications did not simply abort because the agreement expanded to include construction work in Pennsylvania.

19

## ULTIMATE CONCLUSION

While this court does not find personal jurisdiction of the general nature, it does conclude that it has personal jurisdiction of the specific nature. Of course, all cases have to be determined on their own facts and the totality of circumstances has to be considered. The court has considered these factors:

(1) Defendant came to Alabama to initiate specific discussions. See <u>Sea</u> <u>Life</u>, 792 F.2d at 991 n 1.

(2) Defendant undertook to do business with an Alabama company.

(3) The materials were not stock products but were manufactured for the plaintiff, or otherwise procured for a particular purpose.

(4) Substantial performance took place in Alabama, in the form of both engineering and manufacturing.

(5) Defendant's representative came to the Alabama plant site to view it and have further discussions before making a final decision. Regardless of whether all issues were discussed, there were discussions about plains, specifications, etc.

(6) The term "negotiation" is not as restrictive as suggested by defendant. It includes all communications for the purpose of reaching an understanding. <u>See</u> <u>Black's</u> <u>Law</u> <u>Dictionary</u>. The general dictionary meaning of "negotiation" is inclusive of relevant discussions leading to an agreement.

Considering all of the above-stated factors and other discussion in this memorandum opinion and a comparison to <u>Sea</u> <u>Lift</u>, the court concludes that:

(1) There was more than a mere "foot-fall" of defendant on Alabama soil.

(2) There was not a mere "boilerplate" contract.

20

(3) There was an agreement as to what state law was to be applied, but that is only one factor to be considered.

(4) The case clearly arises out of and relates to defendant's contacts with Alabama.

(5) Defendant conducted significant activities within Alabama.

The court ultimately concludes that specific personal jurisdiction of the defendant exists in this action. Pennsylvania also has personal jurisdiction, but that is not the initial issue here. The initial issue is whether the plaintiff's chosen forum has jurisdiction.

The court will, on further motion if later filed, decide whether some factual issues in this case related to the construction itself should be severed and transferred for trial in Pennsylvania. This court will at least determine any factual and legal disputes regarding the scope, intent and meaning of the final contract between the parties. There may be construction breach factual issues which should be tried in Pennsylvania.

Other issues the parties may raise by separate motion include whether this action should be stayed pending non-binding arbitration and/or hearings related to the mechanics lien. The defendant has not argued that this action was prematurely brought in view of the non-binding arbitration clause and proceeding. If enforcement proceedings with regard to the mechanics lien(s) have to proceed in Pennsylvania, it would be foolish to judicially proceed in both Alabama and Pennsylvania on the same issues.

The court also continues to admonish the parties to save cost and expense by an honest appraisal of what the contract required or allowed and other issues. The contract was executed by two sophisticated entities. There will be little room for loose interpretation or application. The parties know the truth and can resolve the issues if they are more interested in resolution than a lottery. The parties know who is right and who is wrong on all issues.

21

This the 25 day of April, 2001.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

22